And our first case is United States v. Holzer, 21-1080, and we'll hear from Mr. Smith. May it please the Court, Counsel. I'm Grant Smith with the Federal Public Defenders, and I represent Richard Holzer. May I speak, Your Honor? Yes, Your Honor. I want to turn first to the appeal waiver. And as to the scope of the appeal waiver, there's really two questions before this Court. First, whether 3583 is part of the penalty provided in the statute of conviction. And second, whether an illegal supervised release condition exceeds the maximum penalty. As to whether 3583 is part of the penalty of the statute of convictions, Williams controls on this point. Was Williams a supervised release case? No, Williams was a restitution case. So is it that different? It's not. When you talk about restitution, supervised release has no number, that is. What is the maximum penalty? Right. I just want to stay clear on exactly which question we're answering with that. As to whether 3583 or restitution is part of a penalty provided in a statute, there is no distinction between restitution and the supervised release condition. The government in Williams presented the same argument as it presents here. Specifically, if the statute of conviction doesn't mention these penalties, then they're not part of the penalty. And that's just not true. The Williams Court rejected that. These penalties are provided in every statute. But even if you get that far, what do you do with the generic issue? Well, in Williams it didn't hinge on whether or not there's a quantifiable number as to the statutory maximum. Do you have other authority that would help us? Williams is the most on point. And the line in Williams that I want to direct the Court's attention to is where it's saying what the limits of the MVRA are. And the exact language from Williams is that it's what the district court has the authority to order. That's how it defines the statutory maximum, is the district court's authority. And so that's the exact same as this case here where the district court didn't have the authority to enter a supervised release condition that impermissibly infringe on Mr. Holzer's First Amendment rights. Well, don't we interpret the plea agreement like a contract? And here the plea agreement includes a definition of statutory penalties that seems to make it pretty clear that with regard to supervised release, the statutory maximum they're talking about is three years on the first count and not more than a lifetime of supervised release on the second count. If that was in isolation, I would say, sorry, there's something up on the screen, Judge. If that was in isolation, maybe that argument could hold some weight. But after the Court tells Mr. Holzer that when he's describing the terms of maximum penalty, he says there's a component that's quantifiable, this three years are up to life. And then it goes on to say, and in addition to that, I can impose terms of our conditions to the supervised release. He lists some examples of what he can say as to those conditions. So reading that in the light most favorable to Mr. Holzer or in the way that Mr. Holzer reasonably understood it, it would be that the Court's telling him that, yes, these conditions are part of the penalty. There's no mention whatsoever about what a statutory maximum as to these conditions are. Well, don't you have a numeric limit on the length of supervised release? And are you arguing that the supervised release imposed here exceeds that limit? Not as to the term of supervised release, no. Just the conditions of supervised release exceeds the Court's statutory authority. And as William points out, when you're dealing with defining what a statutory maximum are, there's going to be easy questions. When it comes to a term of imprisonment, the statutory maximum is the 30 years that Williams gives as an example. But when you have these sort of squishy statutory maximums, such as supervised release conditions or restitution, really the Court's left with two options. The first is to say there's no statutory maximum whatsoever. And Williams makes clear that that's not this Court's precedent. There is a statutory maximum even when there's not a quantifiable number attached to the district court's authority. Both of you happen to, I think, agree that in pleading guilty that there was an agreement that three years' supervised release was identified as one of the components of the maximum penalty. And we know from Sandoval that supervised release is part of the sentence. My question is, under 3583, is the intent of the conditions, the qualitative components of supervised release, are those intended, contemplated, to penalize a defendant? Or are they intended to do something entirely different, to rehabilitate, to integrate an individual post-sentence, post-confinement into society? Both. I think if you look to the government cited authority in their footnote, I believe it's Winston out of the Eighth Circuit, the Court acknowledges that it can have both a punitive, and our supervised release conditions can have both a punitive and a rehabilitative purpose. In order to determine whether it has a punitive purpose, a court will look to the effect of the condition and the stated purpose for the condition. Have you argued that the district court in this case, obviously you disagree strongly with the condition to the degree that it allegedly violates its First Amendment rights, but have you argued, have you claimed that the district court imposed that condition, condition number nine, in order to punish Mr. Holster? It's the government's affirmative argument that it's not a punishment. They raised this argument. And they didn't point to anything in the record where the court said this condition is to punish you. And there's a problem there because the court didn't articulate what the purpose of this condition was. Well, I'm asking you. You're saying that it's part of the condition number nine exceeded the maximum penalty. And so back to Judge Briscoe's original question in terms of the quantitative element, I'm just wondering, you have not only the numeric component of the term maximum, but you also have the noun penalty. And if you're saying that condition number nine was a penalty and it exceeded the realm of conceivable penalties that could be imposed on Mr. Holster, it seems to me that it's you that would have to be arguing that this was a penalty, condition number nine, that exceeded the permissible penalties that could be imposed. I would disagree in that framing. And then I think, as Winston points out, it starts with the presumption that these are penalties. So these conditions aren't imposed for purely rehabilitative purposes. That's not step one. We assume that they're both purposes. They're both punitive and rehabilitative unless both the purpose and the effect of the condition show that it's not punitive whatsoever. And then it falls into that second camp. So I think the burden, if the government argues that, well, this isn't punitive at all, they would have to show that in purpose and in effect it didn't have a punitive component to it since it does serve both purposes to start with. Before moving off the topic of the statutory maximum, I think if Mr. Holster would challenge a restitution amount, he would be able to appeal that under this court's established precedent in Hudson and in Williams. I don't think that there should be any distinction between someone's illegal loss of money and someone's illegal loss of a core constitutional right. If restitution gets beyond these appeal waivers, an illegal supervised release condition should as well. Turning to the merits of Mr. Holster's claim, I don't think there can be any serious debate that the condition here does infringe on Mr. Holster's First Amendment right. At face value, it states he can't possess any of these numerical symbols. Well, are you reading? Let me. Go ahead. Go ahead, Judge McHugh. When you look at paragraph nine and I look at your briefing, it's almost like you want to break off the second sentence from the first sentence. And it seems to me that the fair reading is everything it says about the specific items is limited by the first sentence that says to the extent they're associated with antisemitism or white supremacy. Would you agree with that? No, because of the record in this case and the way that this condition evolved. Originally, the proposed condition by probation was that you can't possess any material that's associated with antisemitism. Mr. Holster's counsel objected to that and said, well, what does that mean? Who's to decide what's associated with that gives way too much control to the probation officer. So the district court changed the condition, was very clear at the hearing. I'm changing this to address the defendant's concerns. And what I'm doing is removing any potential for someone else to decide this. I'm saying exactly what conduct is prohibited. And the court's direct quotes was I'm saying what he can do and what he can't do. So against that backdrop, I think our reading is the better interpretation and that the court's saying. You're asking us to interpret it, I believe, in kind of an absurd way, which is that the district court in trying to give some examples of what the court meant by antisemitism and white supremacy. Then when it said the number 12 or 14 meant in any universe of use of those numbers, even if it has nothing to do with antisemitism or white supremacy. And I just don't think that's a fair reading, either of what the court said on the record or special condition nine. Well, I think it has to be the right reading because, first, the record. And second, if read in the way that the government proposes, you create the situation of what does it mean to be associated with in context? So then it becomes unconstitutionally vague. Could you give us an example where a court couldn't reasonably determine whether or not it was associated with white supremacy or antisemitism? Well, if Mr. Holzer had Thor's hammer, I think is a perfect example. And he meant it to support his religious, the peaceful component of this religion. But the probation officer views it as, no, that's associated with. So if he was walking around with a hammer, I don't know what you mean. Or say he had it as part of his religious ceremony or had it on a T-shirt. That image is associated with antisemitism and white supremacy. But Judge Moore specifically explained that the Celtic cross, the numbers, Thor's hammer, wasn't intended to cover anything other than something that is clearly associated with white supremacy or antisemitism. So if he has an odinistic ceremony or something like that and he has a Thor's hammer, do you really think that Judge Moore was saying, no, the probation officer should come and disrupt that religious ceremony and take away that hammer? Of course, as Judge McHugh said, that's clearly contrary to what Judge Moore said. Well, the question isn't what Judge Moore would do. It's how Mr. Holder could interpret this. Well, in the transcript that we've all read of what Judge Moore said, how could anybody interpret what Judge Moore said in elucidating on what Condition No. 9 meant to say that that would have been contrary to Condition No. 9? I think it would be in line with what Judge Moore said to have him at a religious ceremony, a religion that is well-documented as being associated with white supremacy. But Judge Moore repeatedly said, I am doing nothing that will inhibit practice of your religion. He said that repeatedly. But I don't think that can be true in that he is impacting his ability to freely exercise his religion. I mean, it's inarguable that Mr. Holder couldn't go join a sect of this religion that espoused white supremacy. He just couldn't. That would be prohibited under this religion. So that statement just is not true. I think Judge Moore didn't understand exactly how this hammer is incorporated into these religious practices. I would like to reserve the remainder of my time. Okay. Paul, please stop the clock. So we're not going into your rebuttal time. Do you have any questions? No. Judge McKinney. Okay. Thank you. Good morning. May it please the Court. Paul Farley for the United States. The reply brief makes much of the Williams decision. But that case actually supports our position, we believe, in that it underscores the distinction between the length of a sentence or a component of a sentence and how that is to be served. I think, as Judge Bacharach observed, it's the difference between a quantitative and a quantitative sentence. A quantitative and a qualitative component. Let's take imprisonment, of course. Each charge here carried a maximum of 20 years, but how or where that sentence is to be served isn't part of the statute of conviction. Likewise, restitution, as Williams tells us, has a less obvious sort of maximum that requires more work to ascertain. But in the end, we end up with a concrete number, a quantity. And although the appeal waiver in Williams didn't block the appeal of the amount of restitution, it's interesting here, it would have blocked the appeal of the apportionment of that restitution. I'm referring to passage 10F4971. The plea agreement allows him to appeal other matters than the appeal waiver otherwise would have barred, such as the apportionment of restitution. In other words, in this particular case in Williams, once the appeal waiver was broken, everything was on the table. But the court observed, but for that, even though you had the restitution quantity, which was outside the appeal waiver, the apportionment to various victims still would have been blocked. And I think that supports our position that you need a quantifiable number at the end of the day. In this case, it would be the years of supervised release as opposed to qualitatively. You know, how does that occur? And in this case, when the plea agreement specified the applicable maximum statutory penalties, it did so in quantifiable amounts of imprisonment, supervised release, and fine. And the circuits that have considered this question are in accord. And we've cited cases from the 6th, the 11th, the 5th that all talk about that a statute is a number, or statutory maximum is a number. Do we have any cases that are directly on point with our situation here, or just the concept that you've just described? Well, on the statutory maximum, those are the three circuits I'm referring to. In terms of a supervised release provision, we have the Ferguson case from the 6th, Stevenson from the 3rd, and Hartshorn from the 5th. These are all on our brief, which talk about if you're talking about a special condition exceeding the statutory maximum, the 6th circuit said that requires a strain construction. So those three all are directly on point? Those are supervised release cases. And we have not, this circuit has not ruled? Not that I could find. Not that I could find. But the condition of supervised release, as opposed to a term of supervised release, even if it is an unreasonable one, does not exceed the statutory maximum, and that's the Yiping-Ku case from the 5th circuit we cited. And, of course, this shouldn't be remarkable, because when a defendant enters into a plea agreement, they waive or can waive any of a number of constitutional rights, both rights in existence and those that may later appear through judicial interpretation. That's the Porter case from this Court, 2005. And, of course, a waiver of an appeal includes the right to be able to appeal an error. In fact, that's kind of the purpose of an appellate waiver is not to waive frivolous claims, but to waive ones that may have merit. And certainly conditions of supervised release are subject to a waiver, and the case that we cited in our brief is the Kilman case from 2015 in this circuit. It's an unpublished decision, but it seemed to be kind of the closest one that I could find. And the important thing here is that the defense's interpretation would effectively swallow the waiver  And, again, quoting Ferguson, the logical consequence is that special conditions by default are in excess of the statutory maximum because they are not listed as part of the statutory maximum sentence. Under such reasoning, one could appeal any special condition. And I would say not only would it swallow the waiver. Let's talk about miscarriage of justice just for a moment. There are four aspects of miscarriage of justice. You know, whether district court relied on an impermissible factor such as race, not here. Ineffective assistance to counsel in connection with the negotiation of the waiver, not here. The waiver is otherwise unlawful, and that is the waiver itself is unlawful, not here. And the third one is the sentence exceeds the statutory maximum. So really what you end up with is that any time there's a sentencing claim, forget the waiver, forget the text of the waiver because it's going to be a miscarriage of justice. And I just don't think that's really what this court's precedence contemplates. Well, he has argued that, in addition, we've recognized that the imposition of an illegal sentence is itself a miscarriage of justice. Right, right. And I would submit, Your Honor, that the cases where this doctrine of miscarriage of justice was from, and this is, to my recollection, the District of Colorado has never done this, but other districts have previously had waivers that didn't allow any challenge of the sentence. And so, again, if you had a sentence, if you had a waiver that said you can't appeal any part of your waiver, you have a 20-year max statute, you get 30, you come in under the miscarriage of justice. You can't let this stand because, again, it exceeds the maximum. But I'm saying if you're saying any kind of part of the sentence calculation, you know, whether it's a guideline question or a supervised release, if those are in, those are all miscarriage of justice, too. And I just don't think that's what this court was after. Even if it's unconstitutional, this provision, the supervised release condition? Well, yeah, I think you can waive constitutional rights, so I'm going to come back to that. And particularly in the case of miscarriage of justice, or I'm sorry, miscarriage of conditions of supervised release, defendants always have the option of returning to the court and asking for a modification of a condition of supervised release down the road. Again, this defendant is- But that would mean that they'd live with this unconstitutional provision once they're on release. Well, I would say this defendant might have a more ripe claim on that as we get closer to release. We're several years away from that now. But right now, these conditions are sort of academic questions because the defendant is not anywhere near being released on supervised release. But we can still review them. We've held- Yeah. We can still review conditions. Yeah, I don't think this is sort of the Cabral case, for example. So, no, I'm not saying it's not reviewable at this point. I'm just saying if there's a concern about an unconstitutional condition, first of all, I think that's waivable. Second of all, because it's supervised release, there are opportunities down the road if it really becomes an issue. I mean, if you have a probation officer, let's say he's released, and you have a probation officer who's walking into his apartment in the middle of the ceremony and saying, hold on a second, okay, you might have a basis to go back to judge Moore and say, is this really what you had in mind? So I don't have anything further on the appeal waiver unless there are questions. I have a question. If the condition of supervised release was on its face blatantly unconstitutional, if it said you may not participate in organized religious ceremonies, would that be a miscarriage of justice that would allow us to step in? Your Honor, I would say theoretically, but, again, we have to bear in mind the state of the record and what findings may have occurred. As Judge Moore himself observed here, he believed, and he said this specifically, that based upon this record, he might well be able to say, I forbid you from practicing this religion because it leads you to very dark places. But then he goes on to say, but I haven't. And could we conceive of – But my question was not specific facts of this case. It was more the scope of the power in the face of an appeal waiver to deal with a blatant miscarriage of justice. Again, the miscarriage of justice precedent in this circuit identifies four exceptions. I guess I would say because that is a judicial doctrine, the court would certainly be able, I suppose, to introduce a fifth exception depending on the situation. But what you're describing, Your Honor, I don't believe fits into any of the four exceptions from the controlling precedent of the Tenth Circuit. You don't think that that special condition would exceed the maximum penalty? I don't think it does. It exceeds the statutory maximum because that's what the – I'm talking about the Cudjoe case from 2011. There are other cases. But that case certainly refers to a statutory maximum. And that suggests there are other kinds of maximums, which might be in terms of abridgments of liberty, that would escape miscarriage of justice. But again, as I say, it's a judicial doctrine. So on the right fact situation, it's certainly plausible the court might consider another application of miscarriage of justice. I'm just – I think that this is what the law currently says. Thank you. Turning to – we have four minutes. Just to the merits very quickly. I think it was Judge McHugh that observed, you know, textually we have two components to the special condition. One that establishes a clear, explicit general mandate forbidding material depicting support for association with anti-Semitism or white supremacy. And then a second sentence that gives examples to flesh that out. Those examples were, as Mr. Smith indicated, directly a result of a colloquy between counsel and the court about what does this mean. And Judge Moore said, okay, I'll give you some examples so that we all have kind of a framework here to understand what this means. And so the prohibition on Thor's hammer, the Celtic cross, and the various numbers are properly understood as applying in that context. The court didn't entirely prohibit contact with those three items. But it did caution that if that religion is going to be used as a cloak to be discussing or associating with supremacists and supporting Nazism and supremacism, then he's going to find himself back here as simple as that. So that's at volume three, page 111. So Judge Moore was employing, as best he could, a balanced, focused approach in this context. Well, but you've got the next phrase, which sort of cuts against what you've just argued. Specifically included in this prohibition. That's good. That's good for you. But then it says, without limitation. That's right. So then we're saying, all right, you can't use the number 12, 14, 18 without limitation. In that context. In that context. No, I think what the judge is saying, look, if there's something not in this list, which I can't think of, but pops up as becoming a trigger for, you know, anti-Semitic. That makes this even more broad and more unconstitutional, doesn't it? I don't think it's overbroad, and I don't think it's unconstitutional. Because, again, we have to look at the context of the case. And I'm happy to walk through the Engelhardt factors, those three steps. Because I think this is not a closed case. This is not a closed case. If you start with the particularized findings, you can begin with the highly detailed stipulation of facts in the plea agreement. And I won't go through it line by line, because I've got less than two minutes to go. But that illustrates the defendant's lifelong obsession with anti-Semitism and white supremacy. And not just his willingness, but a single-minded desire to go beyond just thinking and talking about it. By taking violent action on a large scale. And his efforts to actively recruit others to his cause. This is a dangerous person. And, you know, there's plenty in the record if you want to look at how he refers to people that are not like himself. And how he wants to treat them. The court itself explained at some length that he found, in terms of connecting this up with the conditions of supervised release, how dangerous this person was, about how he was bragging about it. And he wants to go out on top. And then, in addition to how dangerous he is all on his own, the court further found he's someone who doesn't simply wallow in his hate. He reaches out into the world in terms of people he meets with, raising concerns about those who would be inspired by him. I mean, there's even a passage in the PSR, which Judge Moore referred to, where he's trying to persuade a probation officer to give this look. You certainly, I think, make an eloquent argument that Judge Moore identified a number of very concerning things about the level of vitriol in his anti-Semitism and his passion for white supremacy. The difficulty, I think, from a legalistic standpoint is some of these religious symbols are also symbols of white supremacy. Thor's hammer, for example. And so we have a rather extended colloquy that Judge Moore explains the meaning behind condition number nine. This man has been sent to prison for 235 months. When he gets out, there will be no grant price to be his lawyer. He's going to be out. There won't be a transcript. He is going to be sent to supervised release with condition number nine without the benefit of all of that. And I'm just concerned from a pragmatic standpoint how we compress the meaning of condition number nine based on this extended colloquy when, as a practical matter, none of that will be of benefit in 235 months. Well, I guess I see my time is up. May I? Sure. Okay. First of all, I don't think these three items, which is all we're talking about, because the other ones haven't been challenged. And in the reply brief at 16, the defense concedes that these three items are all associated with anti-Semitism and white supremacy. So we're really talking about around the margins here, I think. And on that point, I think, you know, the court always has the ability under the Barra case and others if it wants to try and construe this narrowly. I think Judge Moore was attempting in his extended statements trying to construe it narrowly to say, you know, we want to see a connection between these things and the prohibited, the anti-Semitic, the white supremacist views. And so to the extent the defendant is concerned about can he have an Avengers DVD, I guess I'm here to say I'm not sure I see the problem there. You know? And if a probation officer sees a problem there, there's an opportunity to deal with that. But we're really talking around the margins. You know, does someone write him a check for $88? You know, on this point, I refer to the Ross case from the Ninth Circuit we cited in our brief, which, again, had the point they were dealing with a neo-Nazi white supremacist there and said, you know, this guy knows what I mean when I say neo-Nazi or white supremacist. You know, I don't have to draw a complete picture here because he knows what it is. That's what he's been swimming in, in this case, pretty much his whole life. And so I think a lot of this is a tempest in a teapot because we're not worried about someone giving him a check. We're not, come on, what are we talking about? He knows what we're talking about. And certainly Judge Moore knows what he's talking about. And Judge Baccarat, I don't know if I can give you a more definitive answer than that. But I think this is, so with that, we would ask that, well, in the first instance, the appeal be dismissed on account of the appellate waiver. Failing that, we'd ask for an affirmance. Thank you. Judge McKeon? Oh, I'm sorry. I have nothing further. Judge McKeon? Okay. No. Thank you. Mr. Smith, you do have rebuttal time. And I apologize for calling you. I know a Grant Price is an excellent lawyer and a Grant Smith is an excellent lawyer. And I sometimes get you gentlemen confused. So I know who you are. I take no offense. Apologies. You can call me Judge Smith in response. I just want to touch briefly on Judge McHugh's point of 35, this court has interpreted and placed constitutional limits on 3583's statutory limits. And you can waive procedural rights, as the government pointed out, but you can't waive substantive rights. As Judge McHugh referenced, you can picture a much more egregious supervised release condition that said, Mr. Holzer can't talk to anyone. He can't have any information. And under the government's theory, that would be completely unassailable under the appeal waiver. Accordingly, we respectfully request that this court remand so that the district court could vacate the condition. Thank you very much. Well presented in your briefs and arguments as always. This matter will be submitted.